# EXHIBIT "A"

### Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT COURT OF TEXAS
 3                     HOUSTON DIVISION
    _____
 4                                )
    NATIONAL OILWELL VARCO, L.P., )
 5                                )
         Plaintiff,               )
 6                                )    Case No.
    VS                            )
 7                                )    4:22-CV-02006
    JULIO GARZA,                  )
 8                                )
         Defendant.               )
 9  _____)
10
11
12
13
14
15      VIDEOTAPED ORAL DEPOSITION OF JULIO GARZA
16                     JULY 9, 2022
17
18
19
20
21
22
23
24 REPORTED BY:
25      Lisa J. Brannon, CSR, RPR, CRR
```

### Page 2

```
 1      VIDEOTAPED ORAL DEPOSITION OF JULIO GARZA,
 2 produced as a witness at the instance of the
 3 Plaintiff, and duly sworn, was taken in the
 4 above-styled and above-numbered cause on the 9th
 5 day of July, 2022, from 9:03 a.m. to 12:20 p.m.,
 6 before Lisa J. Brannon, CSR, RPR, CRR, reported
 7 by machine shorthand via Zoom, pursuant to the
 8 Federal Rules of Civil Procedure and the
 9 provisions stated on the record.
10
```

### Page 3

```
 1              A P P E A R A N C E S
 2
   APPEARING ON BEHALF OF PLAINTIFF:
 3
        Stuart Lapp, Esq.
 4      Joshua Redelman, Esq
        STIBBS & CO., P.C.
 5      750 William D. Fitch Parkway
        Suite 210
 6      College Station, Texas  77845
        Telephone:  281-367-2222
 7      Email:      slapp@stibbsco.com
                    jredelman@stibbsco.com
 8
 9
   APPEARING ON BEHALF OF DEFENDANT:
10
        Adam Israel, Esq.
11      BALCH & BINGHAM, LLP
        811 Louisiana Street
12      Suite 1010
        Houston, Texas  77002
13      Telephone:  205-226-3495
        E-mail:     aisrael@balch.com
14
15
   ALSO PRESENT:
16
        Barrett Parker, videographer
17
```

### Page 4

```
 1              I N D E X
 2                                              PAGE
 3 Appearances.................................   3
 4 WITNESS:  JULIO GARZA
 5      Examination by Mr. Lapp.................   7
 6 Certification of Deponent.....................112
 7 Reporter's Certificate........................114
```



Page 29
1  Q.  And maybe you misunderstood my
2 question.  I understood that answer to be between
3 the time you first contacted Array and they made
4 you an offer was a couple of weeks.
5  A.  Yes.
6  Q.  Do you recall how much before you and
7 Array first started talking to each other you had
8 started looking for a job?
9  A.  It was probably a couple of weeks
10 after, like a few weeks, I guess.
11  Q.  So just to make sure the record's
12 clear, so the best of your recollection is that a
13 few weeks before you and Array started talking is
14 when you started looking.
15  A.  No.  Looking for jobs, no.  Talking to
16 Array -- you mentioned when I started talking to
17 Array, not looking for jobs.
18  Q.  Okay.  And thank you for clarifying.
19 So if the record reflects that you interviewed
20 with Array -- did your interviews with Array on
21 about April 19th, would you have been talking to
22 them for a couple of weeks before that?
23  A.  Right.
24  Q.  And would you have been communicating
25 with them for a couple of weeks before that

Page 30
1 couple of weeks?
2  A.  No.  It was through the -- their
3 LinkedIn, so I applied online, and then I
4 received an email that they wanted an interview.
5  Q.  Okay.
6  A.  So there wasn't any communication until
7 after the e-mail came.
8  Q.  Okay.  And do you recall how much time
9 between the email asking for an interview and the
10 interview actually took place, how much time
11 elapsed?
12  A.  A couple of days.
13  Q.  Okay.  Did you interview with them
14 remotely?
15  A.  Yes.
16  Q.  Zoom?
17  A.  I believe it was Teams.  I don't
18 recall.  It was some video process, right.
19  Q.  Who did you interview with?
20  A.  I had about five, so do you want me to
21 describe --
22  Q.  Well, let's start with the first one.
23  A.  HR representative.
24  Q.  And over what period of time do these
25 five interviews take place?

Page 31
1  A.  It was around two weeks.  It was very
2 quick, the process.  The first interview was with
3 an HR representative.  She was just going through
4 the usual bidding process.
5      Then after that I believe I
6 interviewed with my current boss, Todd Andersen.
7 Then after that I interviewed with -- I forgot
8 his name, but he seems to be another principal
9 engineer at Array.
10      And then after that, I believe it
11 was last one, it was HR, Todd, yeah, because the
12 last one was -- I think it was four or five, but
13 the last one was with another principal engineer
14 and the CTO.
15  Q.  CTO would be the chief technology
16 officer?
17  A.  Yes, sir.
18  Q.  Who is that?
19  A.  I don't know his last name, but his
20 first name is Terry.
21  Q.  And who is Nate?
22  A.  Nate is a manager to an engineering
23 group.
24  Q.  And did you interview with Nate as
25 well?

Page 32
1  A.  Yes.  He was the other person with
2 Terry.
3  Q.  And so it's your recollection that
4 that -- that that interview process from HR to
5 the last took about two weeks?
6  A.  I believe so.  It was very quickly.
7  Q.  Okay.  And to tie a bow on the prior
8 question, is it correct that there was a period
9 of time that before the two weeks with Array that
10 you had been looking for other employment?
11  A.  Right.  I had other interviews with
12 different companies.
13  Q.  Do you recall how many other companies
14 you interviewed?
15  A.  I think there was two more.
16  Q.  Okay.  And do you recall generally what
17 period of time those interviews took place?
18  A.  It was probably within a month,
19 possibly a month.
20  Q.  The month prior to talking to Array?
21  A.  I would say that would be fairly
22 accurate.
23  Q.  Okay.  So if you were talking to Array
24 the first to middle part of April, you may have
25 been talking to these other people back in March?



Page 37

    1  record at 10:03.
    2         (Recess taken 10:03 to 10:05)
    3         THE VIDEOGRAPHER:  We're back on
    4  the record.  Is time is 10:05.
    5     Q.  (BY MR. LAPP)  Mr. Garza, I'm sorry for
    6  the start and stop on this.  This is not usual.
    7         The last question I think, just to
    8  make sure we're correct, based on the timing, the
    9  date on Exhibit 3, you think that the interview
   10  process with Array started sometime around the
   11  first part of April, correct?
   12     A.  Right.
   13         (Exhibit Number 2 marked.)
   14     Q.  (BY MR. LAPP)  Let me show you what's
   15  been marked as Exhibit 2.  And I will represent
   16  to you that this is a printout that has been
   17  attached to the petition in this lawsuit as
   18  Exhibit C.  And there is testimony in the record
   19  in this case that what is reflected on this
   20  Exhibit 2 is information which was gleaned from
   21  NOV's computer system after an examination of
   22  your NOV-issued laptop computer, okay?
   23     A.  Okay.
   24     Q.  Do you understand what I've just told
   25  you?

Page 38

    1     A.  Yes.
    2     Q.  So if you look on Deposition Exhibit
    3  Number 2, if you look in column C --
    4     A.  Yes.
    5     Q.  -- which is event time, you see the
    6  dates there of 4-22, and if you scroll down, we
    7  look down it's 4-20, and then further down is
    8  April 13th.
    9     A.  Correct.
   10     Q.  All the way down to the fourth page,
   11  and beginning on line 1 and 5, it switches from
   12  April 13th to February 22nd.  Do you see that?
   13     A.  Yes.
   14     Q.  Okay.  So I will represent to you that
   15  there is testimony in this record in this case
   16  that that event time that's listed on this
   17  exhibit indicates a time that was logged from
   18  your NOV computer in which the files or
   19  information -- the file path in the far column
   20  was transferred from your NOV computer to an
   21  external storage device, a USB drive.
   22     A.  Okay.
   23     Q.  Do you dispute that there were
   24  instances, as reflected on this Exhibit C, where
   25  you inserted an external USB drive and you ran it

Page 39

    1  on the computer and downloaded files?
    2     A.  Yes, this reflects it.
    3     Q.  Okay.  You don't dispute that.  You are
    4  agreeing that this reflects that.
    5     A.  Right.
    6     Q.  And you don't have any evidence that
    7  would contradict or say that this is not
    8  accurate.
    9     A.  No, I don't have evidence.
   10     Q.  So it looks like the -- quite a number
   11  of instances on April 13th where files were
   12  downloaded, some instances on April 20th where
   13  files were downloaded, and then a single instance
   14  on April 22nd where files were downloaded.  Do
   15  you agree that that's what's reflected on this
   16  exhibit?
   17     A.  Yes.
   18         MR. LAPP:  Off the record.
   19         THE VIDEOGRAPHER:  We're off the
   20  record.  The time is 10:08.
   21         (Recess taken 10:08 to 10:09)
   22         THE VIDEOGRAPHER:  We're back on
   23  the record.  The time is 10:09.
   24     Q.  (BY MR. LAPP)  Mr. Garza, the column B
   25  on Exhibit 2, you see where there's a notation

Page 40

    1  that says NOV/Garza 12?
    2     A.  J2.
    3     Q.  Oh, J2.  Is that your user name at NOV?
    4     A.  Yes.
    5     Q.  So looking at the entry, the event time
    6  on 4-22-22, that date of 4-22 was actually after
    7  you had submitted your -- or talked about the
    8  fact that you were resigning from NOV, correct?
    9     A.  No.  That was two days after my
   10  interviews.  I didn't have an offer from Array
   11  yet, right, because April 20th is 4-22-2022,
   12  which would be the second day after my
   13  interviews; is that correct?
   14         THE WITNESS:  April is the fourth
   15  month of the year?
   16         MR. ISRAEL:  Right.
   17     A.  Right.  So I did not have an offer from
   18  Array at the time.  It was a completion of my
   19  interviews.
   20         (Exhibit Number 4 marked.)
   21     Q.  (BY MR. LAPP)  Let me hand you what's
   22  been marked as Exhibit 4 and ask you if you can
   23  identify that, please.
   24     A.  This is -- it's an official letter from
   25  Array from their HR saying that this is my offer



Page 41

1 letter.
2    Q.   So this is -- this is an email from
3 Array's HR department dated Friday, April 22nd,
4 2022, at 11:15 in the morning that says they are
5 making you a conditional offer of employment and
6 there's information on how to click on the offer
7 letter in this email, correct?
8    A.   Correct. That is correct, yes, sir.
9         (Exhibit Number 5 marked.)
10   Q.   (BY MR. LAPP) Let me hand you what's
11 been marked as Exhibit 5.
12   A.   Okay.
13   Q.   Let me ask you if you can identify
14 that.
15   A.   That is my resignation letter to
16 Mr. Whitnell.
17   Q.   And it's dated April 21st, 2022,
18 correct?
19   A.   Correct.
20   Q.   So back to my question about Exhibit 2.
21   A.   Uh-huh.
22   Q.   The download you made on April 22nd --
23   Q.   Right.
24   A.   -- was after you had written to
25 Mr. Whitnell telling him you were resigning,

Page 42

1 correct?
2    A.   Correct. That was the night before,
3 yes.
4    Q.   We talked earlier today about the fact
5 that you claim that you routinely made downloads
6 and so forth on an external storage device.
7    A.   Correct.
8    Q.   Do you recall that testimony?
9    A.   Yes.
10   Q.   And I was asking you questions about
11 whether you downloaded information from NOV onto
12 a storage device that you took with you when you
13 left NOV. Do you recall that question?
14   A.   Correct.
15   Q.   Everything that's on this Exhibit 2 you
16 downloaded onto an external storage device that
17 you took with you when you left NOV, correct?
18   A.   It seems so, yes.
19   Q.   Including the document that you
20 downloaded after you had resigned.
21   A.   Well, I resigned on the 22nd. This
22 is -- I wrote this the night before.
23   Q.   And you had talked to Ed on the 21st
24 and told him you were resigning, cocrrect?
25   A.   I believe it was on the 22nd, not the

Page 43

1 21st. It was on a Friday. This is Thursday,
2 right? Was the 21st a Thursday?
3    Q.   Yes.
4    A.   Because I recall talking to Ed on a
5 Friday.
6    Q.   If Ed recalled you talking to him on
7 Thursday, would you disagree with that?
8    A.   I would, sir. It's -- I believe I sent
9 him a Teams message so we could check when we
10 spoke, the exact day.
11   Q.   In any event, you completed your
12 interviews with Array on the 19th.
13   A.   Right.
14   Q.   You felt they had gone well. You sent
15 an email to that effect, correct?
16   A.   Correct.
17   Q.   And you got a formal offer from Array
18 on the 22nd, correct?
19   A.   Correct.
20   Q.   Now, you wrote this letter on the 21st,
21 so you must have felt pretty comfortable that you
22 were going to get an offer from Array before you
23 resigned from NOV, correct?
24   A.   I had a verbal, that's why I wrote it.
25   Q.   So you knew on the 22nd, when you

Page 44

1 downloaded that last file, that you were going to
2 work for Array and were going to quit NOV, right?
3    A.   Correct.
4    Q.   So the file downloads that happened on
5 the 20th, on April 20th, and there are at least
6 reflected on this Exhibit 2, beginning on line 5,
7 and going all the way down to line 41, all those
8 occurred on April 20th, correct?
9    A.   Correct.
10   Q.   And that was after you included your
11 interviews with Array and felt they had gone
12 well, true?
13   A.   Correct.
14   Q.   Mr. Garza, some of the information that
15 you downloaded, as reflected on Exhibit 2, were
16 things like calculators and tools and things like
17 that, correct?
18   A.   Correct.
19   Q.   However, some were not, right?
20   A.   Some may be, correct.
21   Q.   And, in fact, included information that
22 by definition of the agreement you had with NOV
23 was company confidential information, correct?
24        MR. ISRAEL: Object to form.
25   A.   According to the definition, yes.



Page 45

1    Q.   (BY MR. LAPP)  So you don't dispute in
2  this case that some of the information that you
3  took with you when you left NOV is company
4  confidential information.
5          MR. ISRAEL:  Object to form.
6    A.   According to the definition, yes.
7    Q.   (BY MR. LAPP)  So you don't dispute
8  that.
9    A.   No, according to definition.
10   Q.   So what you're disputing is the
11 definition, not the fact that you took the
12 information; is that right?
13   A.   Correct.
14   Q.   Okay.  So if, in fact, it turns out in
15 this case that NOV's definition squares up with
16 the legal definition, your quibble would go away,
17 would it not?
18          MR. ISRAEL:  Object to form.
19   A.   I would have to think about it.  I'm
20 not a lawyer, sir, so it's hard for me to make
21 that judgment.
22   Q.   (BY MR. LAPP)  Okay.  And I'm not
23 asking you to make that judgment.  I'm asking you
24 to answer the question.  The question is that if
25 it turns out that NOV's definition, as you recall

Page 46

1  it, on the intellectual property and
2  confidentiality agreement that you signed squares
3  up with the legal definition of confidential
4  information, you agree that you then took
5  confidential information from NOV, correct?
6          MR. ISRAEL:  Object to form.
7    A.   I would have to agree, yeah.
8    Q.   (BY MR. LAPP)  You didn't tell anybody
9  at NOV, Mr. Whitnell, or anybody else, that you
10 were taking that information when you left, did
11 you?
12   A.   No.
13   Q.   You didn't seek permission from NOV to
14 take that information, did you?
15   A.   No.
16   Q.   When you realized that you had that
17 information and that NOV didn't think that was a
18 very good idea, you didn't take any steps to try
19 to give it back, did you?
20   A.   I didn't think about it, sir.  It was
21 information on my thumb drive.  It was still
22 within my possession and it was still
23 confidential because it was not shared.
24   Q.   Now, in fact, you plugged one or two
25 thumb drives that you took with you from NOV into

Page 47

1  your Array-issued laptop, did you not?
2    A.   That's correct.
3    Q.   And what -- for what purpose did you
4  plug those thumb drives into the Array laptop?
5    A.   I have some reference information, like
6  calculators, as I mentioned earlier.
7    Q.   Same thumb drive that the NOV
8  confidential information is on?
9    A.   Correct.
10   Q.   Now, we've talked about, not this
11 morning, but there are two USB thumb drives that
12 you indicated in answers to interrogatories to
13 the best of your recollection were plugged in the
14 NOV environment and also plugged in the Array
15 environment.
16   A.   I believe there was only one, but I
17 gave the other thumb drive that was utilized at
18 NOV as instructed.
19   Q.   Okay.  And the one -- and I think we
20 called it the subject device or the --
21   A.   Yeah.
22   Q.   -- the one on which the information
23 subject to, that's a black or gray USB with a
24 snap-on lid, as I recall.
25   A.   Yes.

Page 48

1    Q.   Okay.  And the other one that may have
2  been said stress engineering, something like
3  that, correct?
4    A.   Yes, correct.
5    Q.   And just so we're all clear and
6  understand, as I understand your testimony, it's
7  the -- it's the first one, the black with the
8  snap-on lid, that is the subject device.
9    A.   Correct.
10          MR. LAPP:  Let's go off.
11          THE VIDEOGRAPHER:  We're off the
12 record.  The time is 10:20.
13          (Recess taken 10:20 to 10:22)
14          THE VIDEOGRAPHER:  We're back on
15 the record.  The time is 10:22.
16   Q.   (BY MR. LAPP)  Mr. Garza, with regard
17 to the information that was on the subject flash
18 drive, you did not obtain permission to take it
19 before you took it, correct?
20   A.   I had permission to have access to it.
21   Q.   That's not the question I asked you.
22   A.   Right.
23   Q.   The question I asked you was you didn't
24 obtain permission to take it from NOV when you
25 left, did you?



Page 49
1    A.   No.
2    Q.   And you didn't offer to give it back to
3 NOV once you realized you had it, did you?
4    A.   No, sir.
5         (Exhibit Number 6 marked.)
6    Q.   (BY MR. LAPP)  I'm going to hand you
7 what's been marked as Exhibit 6 and ask you if
8 you can identify that document, please.
9    A.   This is my offer letter from Array
10 Technologies.
11    Q.   Now, in the -- up in the middle of the
12 page, just the paragraph that says, "This offer
13 is contingent upon successful completion," do you
14 see that?
15    A.   Yes.
16    Q.   It also -- it says -- among other
17 things it's contingent upon you signing Array
18 Technologies' confidential information,
19 non-disparagement and non-solicitation terms, do
20 you see that?
21    A.   Yes.
22    Q.   Do you recall signing that with Array?
23    A.   Yes.
24    Q.   Did you read it before you signed it?
25    A.   Yeah.

Page 50
1    Q.   Is it similar to NOV confidential
2 information intellectual property agreement that
3 you signed in 2019?
4         MR. ISRAEL:  Object to form.
5    A.   I don't recall, sir.
6    Q.   (BY MR. LAPP)  Do you have a copy of
7 this?
8    A.   Electronic, and I don't have access to
9 it anymore.  I lost access once I got put on
10 leave.
11    Q.   Okay.  And you know we asked for a copy
12 of that in written discovery this last week,
13 right?
14    A.   I don't recall.
15    Q.   Okay.  Do you recall participating in
16 answering some questions that we asked in written
17 discovery last week?
18    A.   Yes.
19    Q.   Did you make any request of anybody at
20 Array to provide you a copy of this document?
21    A.   No.  I haven't had communication with
22 Array.
23    Q.   Do you recall what any of the terms of
24 that agreement are?
25    A.   No, sir, I do not.

Page 51
1    Q.   None?
2    A.   No, sir.
3    Q.   Would it be fair for us to deduce from
4 the fact that that agreement is entitled Array
5 Technologies Confidential Information Agreement
6 that Array Technologies has an interest in
7 protecting its confidential information?
8         MR. ISRAEL:  Object to form.
9    A.   I would think so.
10    Q.   (BY MR. LAPP)  Do you recall anything
11 about the terms of that agreement as we sit here
12 today?
13    A.   No, sir, I do not recall.
14    Q.   Did the fact that you signed that
15 agreement when you went to work for Array cause
16 you to stop and go, oh, wait a minute, I think I
17 signed something similar to this when I went to
18 work for NOV?
19    A.   I didn't think of that, sir.
20    Q.   I'm sorry?
21    A.   I didn't think of that.
22    Q.   You worked other places as an engineer
23 other than NOV and Array, correct?
24    A.   Correct.
25    Q.   In your other employment situations

Page 52
1 have you signed confidential agreements,
2 intellectual property agreements, document
3 agreements between you and your employer about
4 confidential information?
5    A.   I don't recall but I would imagine.
6    Q.   That's because as an engineer the job
7 function you performed for your employer involves
8 information that that employer thinks is
9 important and needs to be kept confidential,
10 right?
11         MR. ISRAEL:  Object to form.
12    A.   I would imagine so, but there's a lot
13 of stuff that is not confidential, right, because
14 a lot of the stuff that engineers use are public
15 equations and knowledge and we're just gathering
16 it together to do the calculation of some sort.
17    Q.   (BY MR. LAPP)  But in order to do that
18 calculation, you need the tool that provides you
19 with a form, right?
20    A.   I would say that I am the tool that
21 does that, because I'm the engineer that knows
22 how to utilize such information.
23    Q.   So and I'm not an engineer so please
24 forgive me if my questions are a little bit --
25    A.   No worries.



Page 97

 1 where and when?
 2    A.  No, sir. 'M sorry, I wouldn't know.
 3    Q.  When the thumb drive that you took from
 4 NOV was plugged into the Array laptop, did you
 5 download files off that thumb drive?
 6    A.  I guess I would like to clarify that I
 7 didn't take the thumb drive from NOV.  It was my
 8 thumb drive.  And it had information in it that
 9 was reference information.
10    Q.  Okay.  So with that explanation, can
11 you answer my question?
12    A.  What was your question again?
13    Q.  Did you transfer any information that
14 was on that thumb drive onto the Array laptop
15 computer?
16    A.  Not any that was confidential, not
17 that -- based on their definition, no, I did not
18 download any information onto an Array laptop.
19 Now, I'm not saying I didn't download a file, but
20 that file did not belong to NOV.
21    Q.  And in order to determine what actually
22 was downloaded, we'd need to look at the Array
23 laptop computer, wouldn't we?
24         MR. ISRAEL:  Object to form.
25    A.  I'm not a computer engineer so it would

Page 98

 1 be hard to answer that.  Go ahead.
 2    Q.  (BY MR. LAPP)  And I'm not a computer
 3 engineer either.
 4    A.  Right.
 5    Q.  Would you agree with me that we have to
 6 talk to a computer engineer or a computer
 7 forensics person to be able to answer that
 8 question?
 9    A.  Correct.
10    Q.  And would you agree with me that the
11 best way to determine definitively what got
12 plugged in, when it got plugged in, what, if
13 anything, got moved would be to look at the thumb
14 drive and look at the computer?
15         MR. ISRAEL:  I object to the form.
16    A.  I wouldn't be able to answer that.
17 Sorry.
18    Q.  (BY MR. LAPP)  Would you have an issue
19 or problem allowing a computer engineer or
20 qualified person to look at the device and make
21 that determination?
22         MR. ISRAEL:  Again, I'm going to
23 object to the extent it gets to the defense
24 strategy and that's a decision to be made between
25 counsel and the client.

Page 99

 1    A.  I would have to talk to counsel.
 2    Q.  (BY MR. LAPP)  Okay.  Are you aware
 3 that since June 4th, 2022, NOV has been asking to
 4 see what's on that thumb drive?
 5    A.  I have not been given any of that
 6 information.
 7         MR. LAPP:  Let's take a short
 8 break.
 9         THE VIDEOGRAPHER:  We're off the
10 record.  The time is 11:43.
11         (Recess taken 11:43 to 12:01)
12 individuals
13         THE VIDEOGRAPHER:  We're back on
14 the record.  The time is 12:01.
15    Q.  (BY MR. LAPP)  Mr. Garza, when you
16 received notice that this lawsuit had been filed
17 and that a restraining order had been issued
18 against you, who did you notify at Array of the
19 lawsuit?
20    A.  The first person I spoke to was my
21 direct manager, Todd Henderson.
22    Q.  And do you recall what day that was?
23    A.  No, but it was on Friday.  I do recall
24 that.  It was the Friday -- the afternoon I was
25 going to be with my family when I saw it.

Page 100

 1    Q.  What -- tell me about the conversation
 2 you had with Todd.
 3    A.  Well, I thought it was spam initially,
 4 so I was asking him if he was aware that we were
 5 getting sued, Array, and he said, I don't know.
 6 And then we started -- I didn't open any of the
 7 files just because I wasn't sure if they were
 8 spasm or viruses or whatever, right?
 9         So we identified a person that had
10 been cc'd on there, and then that's when Todd
11 said, yeah, it might be legit, because of the
12 person that was on the -- cc'd on the lawsuit,
13 which is one of Array's counsel, and then that's
14 when we realized it.
15         Then I still didn't open anything.
16 We kind of -- I was told just wait until we
17 talked to the person cc'd on the email.
18    Q.  You mentioned earlier today about
19 somebody from Array who is in Utah.  Does Array
20 have an office in Utah?
21    A.  I'm not sure.  That person was Todd
22 that I mentioned --
23    Q.  Okay.
24    A.  -- and he works remotely.
25    Q.  And does he live in Utah and work



Page 113

1  I, JULIO GARZA, have read the foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3  _____
        JULIO GARZA
4
   THE STATE OF TEXAS        )
5  COUNTY OF _____)
6        Before me, _____, on this day personally appeared JULIO GARZA, known to me (or
7  proved to me under oath or through _____) (description of identity card or
8  other document) to be the person whose name is subscribed to the foregoing instrument and
9  acknowledged to me that they executed the same for the purposes and consideration therein
10 expressed.
11       Given under my hand and seal of office this ____ day of _____, 2022.
12
   _____
13
   NOTARY PUBLIC IN AND FOR
14 THE STATE OF TEXAS
15
16
17
18
19
20
21
22
23
24
25

Page 114

1 STATE OF TEXAS        )
2 COUNTY OF TARRANT  )
3            REPORTER'S CERTIFICATE
4        I, Lisa J. Brannon, CSR, RPR, CRR, do
5 hereby certify that prior to the commencement of
6 the examination, JULIO GARZA was duly sworn by me
7 to testify to the truth, the whole truth, and
8 nothing but the truth.
9        I do further certify that the foregoing
10 is a verbatim transcript of the testimony as
11 taken stenographically by and before me at the
12 time, place, and on the date hereinbefore set
13 forth, to the best of my ability.
14       I further certify that the signature of
15 the deponent:
16       _X_ was requested by the deponent or a
17 party before the completion of the deposition and
18 that the signature is to be before any notary
19 public and returned within 30 days from date of
20 receipt of the transcript.  If returned, the
21 attached Changes and Signature Page contains any
22 changes and the reasons therefore;
23       ___ was not requested by the deponent
24 or a party before the completion of the
25 deposition.

Page 115

1        I do further certify that I am neither
2 a relative nor employee nor attorney nor counsel
3 of any of the parties to this action, and that I
4 am neither a relative nor employee of such
5 attorney or counsel, and that I am not
6 financially interested in the action.
7        Certified to by me this 11th day of
8 July, 2022.
9
10 _____
11    Lisa J. Gretarsson, CSR, RPR, CRR
12
13
14
15
16
17
18
19
20
21
22
23
24
25

