# EXHIBIT "A-8"

JULIO GARZA
NATIONAL OILWELL VARCO V. GARZA

July 09, 2022
93—96

Page 93

1    Q.   Isn't that the title of the document
2 that's Exhibit 17?
3    A.   Correct.
4    Q.   Past summary and outcome?
5    A.   That is correct.
6    Q.   Okay.  And so this is a document that
7 you downloaded after you had been offered a job
8 at Array and after you had handed your
9 resignation letter to NOV, right?
10    A.   Based on the provided information, yes.
11    Q.   And, again, you don't quibble with
12 what -- at this point what --
13    A.   You can't, right?  It's written, right?
14 It's on the document that's in front of me,
15 correct.
16    Q.   And I think you said before that you
17 don't quarrel with the fact that this isn't -- I
18 don't want to put words in your mouth.  I
19 apologize.
20    A.   Well, it's a report that NOV generated,
21 right?
22    Q.   Correct.
23    A.   Like those documents may or may not
24 still be on the thumb drive, and it still hasn't
25 been proven, so -- but this is a document that

Page 94

1 shows activities that were on my laptop to a
2 thumb drive so -- but --
3    Q.   And to the best of your recollection as
4 you sit here today, you recall taking that
5 document, Exhibit Number 17, the past summary and
6 outcomes with Keller Newton, and putting it on
7 your thumb drive.
8    A.   That's what the report states, yes.
9    Q.   I'm not asking you about the report.
10 I'm asking you if you recall having done that.
11    A.   It may have happened, yes.
12    Q.   Okay.  Again, that's not the question I
13 asked you.  What I asked you was, if you recall
14 having done that.
15    A.   No.
16    Q.   Do you recall having done any of this,
17 and by "any of this" I mean taking the documents,
18 the files that are reflected on Exhibit 2 and
19 transferring them to a thumb drive, any of them.
20    A.   Yes.  I remember transferring some
21 files, yes.  Some of them were like the reference
22 information, right?
23    Q.   And in fairness, some of them are not,
24 right?
25    A.   I would probably agree, yes.  And these

Page 95

1 documents, they still retain reference
2 information.  Now, the argument is that if
3 they're confidential --
4       MR. ISRAEL:  I don't think he
5 asked you a question.
6       THE WITNESS:  Sorry.
7    Q.   (BY MR. LAPP)  And that's really --
8 that's really the issue, right, whether --
9 whether what you took is confidential information
10 or not, right?
11    A.   Correct.  That's the argument.
12    Q.   And you have acknowledged today that
13 some of what you took falls at least within the
14 definitional framework of the agreement that you
15 signed with NOV as to what company confidential
16 information is, right?
17    A.   Right.
18       MR. ISRAEL:  Object to the form.
19    Q.   (BY MR. LAPP)  Are you familiar with
20 technical aspects of the computer and a thumb
21 drive to know enough about what information can
22 be gleaned by the technician who looks at the
23 computer -- this is a really, really bad
24 question.  I'm going to start over because he's
25 going to object.

Page 96

1       I think you testified earlier
2 today that, at least with regard to the subject
3 device, the black and gray thumb drive with a
4 snap-on lid, you think that may have been plugged
5 into the Array laptop.
6    A.   Correct.
7    Q.   Okay.  Isn't it true that in order to
8 confirm that one would have to actually look at
9 the Array laptop and say, oh, yeah, here's the
10 unique identifier for the thumb drive, here is
11 what was plugged into this computer?
12       MR. ISRAEL:  Object to the form.
13    A.   I would have to say that that's how --
14 I'm not sure.  I'm not sure how that works.
15    Q.   (BY MR. LAPP)  Okay.
16    A.   I'm not a computer engineer, sir.
17 Sorry.
18    Q.   I'm not even a mechanical engineer
19 so --
20    A.   Sometimes I say I'm not a mechanical
21 engineer myself either, but --
22    Q.   So do you know enough about computers
23 and computer engineering to even be able to
24 answer any questions about what you have to look
25 at to be able to figure out what was plugged into

*admits the usb was plugged into the Array laptop*



Page 97

1 where and when?
2    A.   No, sir. 'M sorry, I wouldn't know.
3    Q.   When the thumb drive that you took from
4 NOV was plugged into the Array laptop, did you
5 download files off that thumb drive?
6    A.   I guess I would like to clarify that I
7 didn't take the thumb drive from NOV.  It was my
8 thumb drive.  And it had information in it that
9 was reference information.
10    Q.   Okay.  So with that explanation, can
11 you answer my question?
12    A.   What was your question again?
13    Q.   Did you transfer any information that
14 was on that thumb drive onto the Array laptop
15 computer?
16    A.   Not any that was confidential, not
17 that -- based on their definition, no, I did not
18 download any information onto an Array laptop.
19 Now, I'm not saying I didn't download a file, but
20 that file did not belong to NOV.
21    Q.   And in order to determine what actually
22 was downloaded, we'd need to look at the Array
23 laptop computer, wouldn't we?
24         MR. ISRAEL:  Object to form.
25    A.   I'm not a computer engineer so it would

Page 98

1 be hard to answer that.  Go ahead.
2    Q.   (BY MR. LAPP)  And I'm not a computer
3 engineer either.
4    A.   Right.
5    Q.   Would you agree with me that we have to
6 talk to a computer engineer or a computer
7 forensics person to be able to answer that
8 question?
9    A.   Correct.
10    Q.   And would you agree with me that the
11 best way to determine definitively what got
12 plugged in, when it got plugged in, what, if
13 anything, got moved would be to look at the thumb
14 drive and look at the computer?
15         MR. ISRAEL:  I object to the form.
16    A.   I wouldn't be able to answer that.
17 Sorry.
18    Q.   (BY MR. LAPP)  Would you have an issue
19 or problem allowing a computer engineer or
20 qualified person to look at the device and make
21 that determination?
22         MR. ISRAEL:  Again, I'm going to
23 object to the extent it gets to the defense
24 strategy and that's a decision to be made between
25 counsel and the client.

Page 99

1    A.   I would have to talk to counsel.
2    Q.   (BY MR. LAPP)  Okay.  Are you aware
3 that since June 4th, 2022, NOV has been asking to
4 see what's on that thumb drive?
5    A.   I have not been given any of that
6 information.
7         MR. LAPP:  Let's take a short
8 break.
9         THE VIDEOGRAPHER:  We're off the
10 record.  The time is 11:43.
11         (Recess taken 11:43 to 12:01)
12 individuals
13         THE VIDEOGRAPHER:  We're back on
14 the record.  The time is 12:01.
15    Q.   (BY MR. LAPP)  Mr. Garza, when you
16 received notice that this lawsuit had been filed
17 and that a restraining order had been issued
18 against you, who did you notify at Array of the
19 lawsuit?
20    A.   The first person I spoke to was my
21 direct manager, Todd Henderson.
22    Q.   And do you recall what day that was?
23    A.   No, but it was on Friday.  I do recall
24 that.  It was the Friday -- the afternoon I was
25 going to be with my family when I saw it.

Page 100

1    Q.   What -- tell me about the conversation
2 you had with Todd.
3    A.   Well, I thought it was spam initially,
4 so I was asking him if he was aware that we were
5 getting sued, Array, and he said, I don't know.
6 And then we started -- I didn't open any of the
7 files just because I wasn't sure if they were
8 spasm or viruses or whatever, right?
9         So we identified a person that had
10 been cc'd on there, and then that's when Todd
11 said, yeah, it might be legit, because of the
12 person that was on the -- cc'd on the lawsuit,
13 which is one of Array's counsel, and then that's
14 when we realized it.
15         Then I still didn't open anything.
16 We kind of -- I was told just wait until we
17 talked to the person cc'd on the email.
18    Q.   You mentioned earlier today about
19 somebody from Array who is in Utah.  Does Array
20 have an office in Utah?
21    A.   I'm not sure.  That person was Todd
22 that I mentioned --
23    Q.   Okay.
24    A.   -- and he works remotely.
25    Q.   And does he live in Utah and work

won't deny that he downloaded files onto Array laptop

